UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
    )
    )    CRIMINAL ACTION
   v.    )
    )    NO. 04-10299-PBS
BENITO GRULLON,    )
    a.k.a. "Quico"    )

UNITED STATES' PRETRIAL MEMORANDUM

_____The United States respectfully submits this memorandum of law and fact regarding the

upcoming trial of defendant BENITO GRULLON, a.k.a. "Quico," scheduled for January 16,

2007.  The government submits as follows:

I.    FACTUAL SUMMARY[1]

On July 30, 2003, in Lynn, defendant Benito Grullon sold a DEA confidential source

(CS) 120 grams of cocaine for $3,600.  During the drug deal, the phone number that Grullon

gave to the CS and used was later connected to a DEA wiretap investigation.  During the wiretap

investigation, Grullon was identified as a supplier of cocaine to co-defendant Manuel Germosen,

a.k.a. "Manolo," one of the primary targets of the investigation, as well as Germosen's brother,

Christian Germosen.

    A.    DEA Cooperating Source Fernando Soto.

Benito Grullon first came to the attention of the DEA in June 2003 from a registered

DEA confidential source (CS), Fernando Soto.  Soto began cooperating with law enforcement

---

[1]The following is a brief summary of some of the facts the government anticipates
introducing at trial and is intended to be only a general overview.  The summary does not
constitute all the facts and testimony the government may seek to introduce at trial.

following his arrest in 1993 based on federal drug trafficking charges.  Soto was convicted in

October 1995 in the case of United States v. Soto, 94-cr-10020-REK and received a reduction of

his sentence based on his cooperation.

Thereafter, Soto began pro-actively cooperating with DEA in exchange for monetary

payments and began a registered DEA confidential source.  Between approximately 1995 and

2003, Soto played an essential role in the arrest of numerous narcotics traffickers in

Massachusetts and New York.   During his time as a registered DEA CS, Soto was paid in excess

of $215,000 for information and services provided.  In addition  to the monetary payments, Soto

also received assistance in obtaining an S-Visa so that he could legally work and reside  in the

United States.  The DEA paid Soto approximately $1,800 for his assistance in the investigation

of Benito Grullon.

On June 28, 2003, Soto informed Det. Steven Edwards of the Cambridge Police, who at

the time was designated as a DEA Task Force Agent in DEA Task Force Group 2, about a

Colombian drug trafficker named Hector Munoz of 33 Fuller Street in Lynn from whom Soto

could arrange to purchase cocaine.  During conversations when Munoz talked about selling Soto

cocaine, Munoz told Soto that he obtained the cocaine from his brother-in-law, "Benny," who

was from the Dominican Republic.  Munoz told Soto that "Benny" traveled back and forth from

New York to Boston to get cocaine and brought back as much as ten kilograms of cocaine at a

time.[2]

On Monday, July 28, 2003, at around 9:00 a.m., Det. Edwards again met with Soto about

---

[2]Following this interview on 6-28-03, Det. Edwards wrote a DEA 6 Report entitled
"Debriefing of CS" but erroneously indicated in the title of the report that the interview took
place on 7-28-03.

Munoz and "Benny." Soto indicated that Munoz was willing to introduce him to "Benny," Munoz's brother-in-law and cocaine source. Soto gave Det. Edwards Munoz's cell phone number, 781-913-6443. Det. Edward gave Soto instructions to get in touch with Munoz to arrange a transaction with "Benny." Det. Edwards also gave Soto a recording device and instructed Soto to record the phone calls that he made to Munoz. Later that same day, in the afternoon, Soto called Munoz and arranged to purchase 125 grams of cocaine from "Benny" for $3,600 two days later on Wednesday, July 30, 2003. Munoz told Soto that his brother-in-law (Benny) would be bringing the stuff to his residence in Lynn at 33 Fuller Street.[3]

    B.    Controlled Purchase of 120 Grams of Cocaine on July 30, 2003.

On July 30, 2003, Soto met Grullon at Munoz's residence in Lynn at 33 Fuller Street. Inside the residence, Grullon sold Soto 120 grams of cocaine for $3,600. Before the actual transaction, at around 2:30 p.m., Munoz met up with TFA Joseph Gallarelli[4] and Det. Edwards at a pre-arranged location. At this time, Munoz placed a call to Munoz at his house phone, 781-598-1829, in the presence of Det. Edwards and TFA Gallarelli. During the phone call, which took place in Spanish, Soto finalized the drug deal with Munoz. After the call, Det. Edwards and TFA Gallarelli searched Soto to make sure he did not have any drugs or contraband, gave Soto $3,600 in official government funds to purchase the cocaine, and equipped Soto with a body wire kel-transmitter around his waist. The kel-transmitter, also known as a "body-wire," permitted agents to contemporaneously hear what was being picked up on the device, and record the audio

---

[3]These phone calls were not recorded. Soto, however, took handwritten notes after the phone call which memorialized the time of the call, the number he dialed to call Munoz and a summary of the conversation.

[4]TFA Gallarelli is also a Detective with the Boston Police Department (BPD).

3

from a remote location.

Soto went to 33 Fuller Street at around 2:25 p.m.  Det. Edwards and TFA Gallarelli maintained surveillance.  As Soto arrived the residence, Soto observed another male arrive driving a light colored vehicle and enter the residence with Soto.  Inside the residence, Munoz introduced Soto to this male as "Benny," his brother-in-law and cocaine source.  Soto then engaged in conversation with "Benny" about the price for the cocaine.  "Benny" reached into his pants in the groin area and retrieved a package of cocaine which he gave to Soto.  In turn, Soto gave "Benny" the $3,600 in cash.  "Benny" then gave Soto his cell phone number, 781-913-6228.[5]  The package was later analyzed in August 2003 by the DEA laboratory and determined to be 120.7 grams of cocaine.

After Soto left the apartment with the cocaine, Soto called out the plate number of the light colored vehicle in which "Benny" had arrived.  Det Edwards heard Soto call out the plate number on the kel-transmitter device.  Det. Edwards thereafter learned that the car was a Toyota Camry registered to Benito Grullon of 170 Union Street in Lynn.

Following the controlled purchase, Det. Edwards neglected to follow proper DEA custody of evidence procedures with the recording from the body-wire and for three other audio recording in the investigation.  Det. Edwards marked the body-wire recording N-1,[6] but the tape played-back at too fast a speed.  Det. Edwards intended to have DEA technicians examine the tape, but the original recording was lost.  In a DEA 6 report about the controlled purchase, Det.

---

[5]As further discussed below, the DEA later obtained phone records for this cell phone number which was subscribed to Juan Barrios, 89 Adams Street, Apt. 3, Lynn, MA.

[6]The reference "N" refers to non-drug evidence.

Edwards indicated that the tape had been submitted to the DEA non-drug evidence custody, but in fact the tape had never been logged into evidence and was later lost.  Det. Edwards retained possession of two working copies of the tapes, but they are now entirely blank.

During the month of August, Soto had several phone conversations with "Benny" at the number he provided to Soto.  During the phone calls, Soto attempted to purchase more cocaine from "Benny."  Following the direction of the DEA, Soto recorded phone calls on August 6, August 8, September 1, and September 2, 2003, but did so outside the presence of law enforcement agents.  In October 2003,  Soto met with Det. Edwards and gave him two tapes which were the recorded conversations that he had with "Benny" on August 6 and August 8.[7] Det. Edwards marked these tapes as N-2 and N-3, but never submitted them to non-drug evidence.  Soto listened to the tapes and wrote out English translations nearly verbatim of the words spoken during the calls.  The original recordings were misplaced and the working copies that Det. Edwards kept are now blank.

C.    Recorded Phone Conversations with Benito Grullon, a.k.a. Benny.

Soto also gave Det. Edwards a tape recording of two phone conversations that Soto had with "Benny" on September 1 and September 2, 2003.  Det. Edwards did not designate an N-number for the tape or seek to submit the tape to the non-drug evidence custodian.  The original recorded was misplaced.  Det. Edwards, nonetheless, held onto a working copy of this tape which contained the audio for these phone calls, but played back at a high rate of speed.  The play back

---

[7]During the wiretap investigation, Det. Edwards gave the tape from the August 8, 2003 phone conversation to a government contractor Spanish speaking monitor.  The monitor compared the voice on the tape to the wiretap conversations between Germosen and "Quico" and opined that they were the same voice.  The government will <u>not</u> be seeking to introduce this evidence for voice identification authentication.

time of the recording has since been slowed by USAO personnel to allow for normal playback

speed.  The only change to the recording was to the speed of the playback.

     D.     The DEA's Wiretap Investigation

Around the same time as the controlled buy from Benito Grullon, the DEA initiated a

wiretap investigation into a Mexican cocaine organization operating in Lynn and Peabody.  The

initial targets of the investigation were Jose Rosales, Valentin Martinez, and Manuel Germosen,

a.k.a. "Manolo."[8]  On August 29, 2003, the DEA obtained authorization to intercept one of

Germosen's cell phones, (978) 335-0175.[9]  The wiretap continued until September 19, 2003

when Germosen ceased to use the phone.

Beginning on October 17, 2003, the DEA began intercepting another one of Germosen's

cell phones, (603) 205-0068,[10] pursuant to court orders.  This wiretap continued for more six

months, until April 17, 2004.  During this wiretap, Germosen engaged in countless drug related

conversations in which he arranged to obtain cocaine and sell this cocaine to a regular group of

drug customers, including Phil Asaro and Gene Anderson.  During many of his drug deals,

Germosen enlisted his younger brother, Christian Germosen ("Christian") to deliver cocaine to

his customers and collect money from them.

For example, on October 25, 2003, at 2:07 p.m. (Call No. 245), Germosen called Jose

Rosales and told him "this guy" was "going to go by there now . . . he's waiting to give you the

---

[8]"Manolo" is a common Spanish nickname for Manuel.  Germosen also used the alias, Kelvin Madera.

[9]This cell number was a T-Mobile prepaid telephone without any subscriber information.

[10]This cell number was also a T-Mobile prepaid telephone without any subscriber information

other one."  Suspecting a drug delivery might be talking place, TFA James Picardi[11] set up

surveillance behind Rosale's residence at 46 Wyman Street in Lynn.  During his surveillance,

TFA Picardi observed and videotaped Jose Rosales give Chrsitian  Germosen a bag.  Through the

bottom of the bag, the video captured a brick-shaped kilogram of cocaine.  Then at 5:32 p.m.

(Call 252), Germosen called one of his drug customers, Phil Asaro, to inform him that this

brother was going to deliver the cocaine to him and told Asaro to give him "28.5," $28,500 for

the cocaine.

      1.      Identification of Benito Grullon on the Wiretaps

Agents first connected Benito Grullon to Manuel Germosen through phone records.  The

cell phone number that Grullon gave CS Soto during the drug deal on July 30, 2003, (978) 913-

6228, had consistent contact with Manuel Germosen.   Between July 23 and August 20, 2003, the

first target telephone for Germosen, (978) 335-0175, had twenty-four (24) contacts with

Grullon's cell phone, (978) 913-6228.   Thereafter, early on the wiretap on Germosen's second

cellular phone, Germosen was intercepting calling Grullon at this same cell phone (781) 913-

6228.  For example, on October 24, 2003, (Call 213), Germosen dialed this number and asked

the home answering the phone for "Benito."  The woman indicated that Benito was not there and

Germosen left a message.  Next on October 27, 2003, (Call 317) Germosen dialed this same

number again and spoke to Grullon.  During the call, Grullon said that had told his wife that 'Oh,

he probably has some good news" (meaning, that Germosen had cocaine to sell to Grullon).

Germosen told Grullon, "Things are very slow right now."

---

      [11]TFA Picardi, a deputized DEA Task Force Agent, is also a Detective with the Revere
Police Department.

During the phone calls with Grullon, Germosen rarely referred to Grullon by name. When on the phone with other people, including his brother Christian, Germosen most often referred to Grullon as "Quico."[12]  On a few occasions, however, he referred to him as "Benito." For example, on March 8, 2004, at 12:46 p.m. (Call 3412), Grullon called Germosen and asked him for a phone number for "Silvestre."[13]  In the very next call at 12:49 p.m. (Call 3413), Germosen called Silvestre and told him, "Oh, look, this man is looking for you, uh…. Benito."[14]

      2.      Expected Testimony of Co-defendant Manuel Germosen, a.k.a. "Manolo."

Germosen met Grullon sometime in 2000 or 2001 through Alex, one of Germosen's drug customers.  Grullon was interested in obtaining cocaine from Germosen, but Germosen did not have a steady supply of cocaine at the time.  Months later, Germosen began working with Andres Martinez, whose nephew, Valentin Martinez, was Germosen's brother-in-law.  Andres obtained large quantities of cocaine, up to 90 kilograms at a time, from a Mexican supplier based in Arizona.  Germosen redistributed this cocaine to his own regular group of drug customers which included Gene Anderson, Phil Asaro,[15] and defendant Benito Grullon.  Germosen gave the money that he made from these cocaine sales back to Andres Martinez who then paid Germosen from the profits.  On approximately five or six occasions, Germosen supplied Grullon with

---

[12]According to Germosen, he referred to Grullon as "Quico" because of a song sung by a Dominican singer named Quico Rodriguez, about a person with green eyes.  Defendant Grullon has stark greenish eyes.  During a phone call on December 24, 2003 (Call 1582), Germosen referred to Grullon as "Quico Rodriguez."

[13]"Silvestre" is Silvestre Lizardo, a defendant in this case and currently a fugitive.

[14]The government will seek to introduce this evidence through Special Agent Jean Drouin and TFA Jaime Cepero.

[15]Asaro and Anderson have both pled guilty in this case and are pending sentencing.

cocaine, typically a kilogram of cocaine at a time.  Germosen fronted the cocaine to Grullon, who

then repaid Germosen within a couple of days.  Germosen gave this money back to Andres

Martinez.

When Andres Martinez, and later then his nephew Valentin Martinez, returned to Mexico

in 2003, supply was bad and Germosen had to seek out other cocaine suppliers, including Benito

Grullon.[16]  Germosen did not know from where Grullon got his cocaine, but at times Grullon was

able to supply Germosen with a kilogram of cocaine at a time.  During these calls, Germosen

never referred to the drugs as "cocaine," but instead refers to the drugs as a "girl" or any other

word besides cocaine.  After confirming that Grullon had cocaine, Germosen met with Grullon in

person at his residence in Lynn.

3.    Intercepted Calls Where Grullon Offered to Supply Germosen with Cocaine

For example, during a call on November 12, 2003 (Call 751), Germosen told Grullon that

"we're slow," and "[t]hat's why I was going to call you, you to find out if... so that I could work

something out" (to obtain cocaine).  Grullon answered that Germosen's prices for cocaine were

much better, but stated that the price was "by the hand" ($25,000 for a kilogram of cocaine).

Germosen asked "And can we do something, anything like that?"  Grullon answered, "Yes, I'll

do it for you, yes."  Days later on November 19, 2003 (Call 898), Grullon called Germosen and

asked him, "Do you still want to arrange for a girl? (a kilogram of cocaine).  Germosen

answered, "No, I already... I had to get something, I worked it out somehow."

Next on December 11, 2003, (Call 1362), Germosen asked Grullon for cocaine by asking,

---

[16]During a phone call on December 11, 2003, (Call 1832) both Germosen and Grullon
lamented about the lack of supply of cocaine. Grullon stated, "Neither the numbers, nor anything.
Not the quantity nor the quality or anything!"

"Are there still invitations to eat?"  Grullon answered, "Yes, there's still something there."

Germosen then said, "Well, I'll stop by there (at your house) to see if we can talk."  Then on

December 17, 2003 (Call 1493), Germosen called Grullon and asked him, "What about the girls,

have they gone dancing?"  Grullon answered, "Yeah, yeah, they are going out."  Germosen

responded, "Oh.  And where can I see you?"   On January 6, 2004, (Call 1954), Grullon told

Germosen some good quality cocaine by referring to a "pretty girl":

> BENITO:     Listen, there's a pretty, pretty, pretty girl coming up today as well, like no one has ever seen around here.
>
> MANOLO:     Ah.
>
> BENITO:     But she's coming tonight, finally.
>
> MANOLO:     Oh, well I…
>
> BENITO:     I went to see her, yesterday I went to see her and --
>
> MANOLO:     Oh, well I will call you, then.
>
> BENITO:     Yeah, you call me because she's going to be really pretty.

Finally, on February 11, 2003, (Call 2656) Grullon told Germosen that he had been

waiting for his supplier of cocaine since around 5 o'clock and that he had several people waiting

for him to get cocaine:

> BENITO:     No... and I have like four people waiting.
>
> MANOLO:     Well, don't leave me out.
>
> BENITO:     No, no, no! On the list, you are the first one.

4.      Intercepted Calls Regarding Christian Germosen

During the time that Andres Martinez was in Mexico, Germosen's younger brother,

10

Christian, did "favors" for Germosen by delivering cocaine to Germosen's drug customers and picking up drug proceeds.  For example, as described above, on October 25, 2003, Christian picked up a kilogram of cocaine from Jose Rosales and delivered it to Phil Asaro.  During the deal, Germosen told Asaro to give Chrisitan $28,500 for the cocaine.

Similarly, on December 17, 2003, Germosen told Christian to deliver $10,000 in drug proceeds to Grullon.  At 7:47 p.m. (Call 1519), Christian told Germosen, "He gave me ten ($10,000).  What should I do with that?  Should I bring it to Quico?"  Germosen responded, "Damn!  Bring it to Quico" and stated that he would call "Quico."  During the very next call at 7:58 p.m. (Call 1520), Germosen called Grullon and asked him, "Are you around so I can send the guy?"  Grullon said he was there, but was about to leave.  Germosen informed Grullon that Christian would be coming over to deliver the money, but "didn't come through with all of it."

In exchange for Christian's agreement to make drug deliveries, Germosen agreed to be responsible to Grullon for the drug debts Christian had incurred with Grullon.  Christian obtained smaller quantities of cocaine from Grullon which Christian sold to his own smaller drug customers.  For example, on March 8, 2004 (Call 3422), Germosen asked Christian if he could give Gene (Anderson) some cocaine.  When Christian asked how much, Germosen responded "Like . . . two and something" (250 grams).  Christian responded, "Oh.  I got it from Quico. I'll try to get it, I'll see if he gives it to me."

In early 2004, Christian often had trouble paying Grullon which caused Grullon to get on the phone and complain to Germosen about his brother.  For example, on February 21, 2004 (Call 2939), Grullon told Germosen that his brother had "turned some papers (money) over to

11

me" for "one motor"[17] (125 grams of cocaine) but there was still some money missing. Grullon

complained that Christian does not answer his phone. Germosen told Grullon, "I'm going to call

him and I'll have him call you. I think we'll work those things out on Monday."

Three days later, on February 24, 2004 (Call 3032), Grullon asked Germosen if he was

"going to send his brother over." Grullon told Germosen that there was a little problem because

of a balance that was left over, and that Grullon could call him (Christian) but "bosses need to

talk first." On April 14, 2004, (Call 4144), Germosen yelled at Christian to call "Quico" and to

stop hiding. Then on April 16, 2004 (Call 4210), Grullon complained to Germosen that

Christian had owed $5,000 for two months. Germosen said he could call and talk to him.

Grullon responded, "Yes, speak with him, and think about getting someone else for me also."

## II. SUMMARY OF APPLICABLE LAW

### A. Overview of Conspiracy Law

Defendant Benito Grullon is charged in the pending Second Superseding Indictment with

conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. The Indictment also contains an

additional allegation pursuant to the penalty provisions of 21 U.S.C. § 841(b)(1)(A)(iii) that the

conspiracy involved at least five kilograms of cocaine.

A conspiracy is essentially "an agreement to disobey or to disregard the law." United

States v. Drougas, 748 F.2d 8, 15 (1st Cir. 1984). To establish the crime of drug conspiracy, the

government must prove: (1) that the conspiracy charged in the indictment existed; (2) that the

defendant knowingly and intentionally joined the conspiracy; and (3) that the defendant intended

---

[17]A "motor" is common code/slang for 125 grams of cocaine and is based on a particular
motorcycle motor with the numbers "125" written on the side.

that the object of the conspiracy (distribution of cocaine) be accomplished.  See United States v. Nelson-Rodriguez, 319 F.3d 12, 27-28 (1st Cir. 2003); United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001); United States v. Flores-Rivera, 56 F.3d 319,324 (1st Cir. 1995)(elements of conspiracy to import cocaine established, absent actual importation of cocaine, where there was knowing and voluntary participation in conspiracy, and intent to effectuate object of conspiracy), citing, United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994). Evidence of an overt act is not required to establish a drug conspiracy under 21 U.S.C. §846.  United States v. Shabani, 513 U.S. 10, 11 (1994).

1.    First Element - Existence of Conspiracy:

To meet the first element, the government needs to prove the existence of a express or tacit agreement to violate the drug laws.  United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989)("Because of the secretive nature of the crime, it is recognized that the agreement may be express or tacit.  The agreement, whether tacit or express, may be proven by circumstantial as well as express evidence.  A common purpose and plan may be inferred from a development and collocation of circumstances").  The First Circuit has recognized that many conspiracies are based on tacit agreements, due to the secretive nature of crime.  See United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1994); Rivera-Santiago, 872 F.2d at 1079; United States v. Glenn, 828 F.2d 855, 857 (1st Cir. 1987).  Tacit agreements may be proven through the use of circumstantial evidence. Rivera-Santiago, 872 F.2d at 1079; United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993) ("There are no particular formalities that attend this showing: the agreement may be express or tacit and may be proved by direct or circumstantial evidence."); United States v. O'Campo, 973 F.2d 1015, 1019 (1st Cir. 1992) (no need for express agreement;

13

circumstantial evidence sufficient); United States v. Pallindo, 203 F.Supp. 35, 37 (D.Mass.1962) ("An agreement may be shown by conduct, by a wink or a nod, by a silent understanding to share a purpose to violate the law").

In this case, the government will seek to introduce evidence to prove the existence of the conspiracy which will include conspiratorial acts that do not directly involve the defendant. For example, on October 25, 2003, Germosen directed his brother Christian Germosen to pick up a kilogram of cocaine from Jose Rosales and deliver the cocaine to another one of Germosen's drug customers, Phil Asaro. During videotape surveillance at Rosales's residence, Rosales handed a bag contained a kilogram of cocaine to Christian. Based on wiretap calls, and the testimony of Manuel Germosen, Christian then delivered this cocaine to Phil Asaro

2.     Second Element - Membership in the Conspiracy

The second element that the government must prove is that the defendant knowingly and intentionally (not by mistake or accident) joined the conspiracy. To prove the defendant knowingly joined the agreement, the government must show the defendant was aware of the "essential nature of the plan, and their connections with it," United States v. Rivera-Santiago, 872 F.2d at 1079, quoting Blumenthal v. United States, 332 U.S. 539,557 (1947). The defendant does not have to be aware of all the details of the conspiracy or of all identities of the other conspirators. United States v. Guerra-Garcia, 336 F.3d 19, 23 (1st Cir.), cert. denied, 540 U.S. 961 (2003). So long as the defendant is aware that the conspiracy extends beyond his or her individual role, the knowledge element is met. Rivera-Santiago, 872 F.2d at 1079.

Here, the evidence at trial will show that Grullon dealt on a regular basis with not only

14

Manuel Germosen, one of the core members of the conspiracy, but also Christian Germosen, Germosen's brother who was occasionally an runner for Germosen.

    3.    <u>Third Element - The Intent to Accomplish the Object</u>:

    The third element the government must prove is that the defendant had the intent to agree and the intent to facilitate the criminal object of the conspiracy. United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994)(the government must "prove an intent to agree and an intent to effectuate the commission of the substantive offense." However, the defendant need not have the intent to personally commit the crime, just assist in its commission. <u>Id.</u> at 615 ("A defendant need not have had the intent to personally commit the substantive crime"). Both the intent to agree and the intent to facilitate the object of the conspiracy may be inferred from circumstantial evidence. <u>United States v. Morales-Madera</u>, 352 F.3d 1, 12 (1st Cir. 2003). Nevertheless, without anything more, the defendant's mere presence at the scene of the crime or mere association with conspirators is not sufficient evidence to establish the required intent. <u>United States v. Nelson-Rodriguez</u>, 319 F.3d at 28.

    Finally, it is well settled that 21 U.S.C. § 841(a) does <u>not</u> require that a defendant knew the kind or quantity of drugs involved in the offense: "The plain language of § 841(b) requires the government to prove only that the offense 'involved' a particular type and quantity of drugs, not that the defendant knew that he was distributing that particular drug type and quantity." <u>United States v. Nelson-Rodriguez</u>, 319 F.3d 12, 44 (1st Cir. 2003), <u>quoting</u> <u>United States v. Collazo-Aponte</u>, 281 F.3d 320, 326 (1st. Cir.2002). Here, the object of the conspiracy, distribution of cocaine, only requires that the defendant knowingly and intentionally distributed a

controlled substance.

    4.    <u>Drug Weight Allegation</u>

In <u>Derman v. United States</u>, 298 F.3d 34 (1st Cir. 2002), the First Circuit clarified the application of drug weight determinations to conspiracy cases, explaining that, "in a drug conspiracy case, the jury should determine the existence *vel non* of the conspiracy as well as any facts about the conspiracy that will increase the possible penalty for the crime of conviction beyond the default statutory maximum; and the judge should determine, at sentencing, the particulars regarding the involvement of each participant in the conspiracy." <u>Derman</u>, 298 F.3d at 42. "The rule, then, is that the government need only allege and prove to the jury the bare facts necessary to increase the statutory sentencing maximum *for the conspiracy as a whole*." <u>Id</u>. at 43. The Court in <u>Derman</u> further specified that:

> This does not mean that a jury need return a special verdict describing the precise amount of drugs involved in the conspiracy. It is enough that the jury supportably determines, beyond a reasonable doubt, that the conspiracy involves a drug quantity that surpasses the threshold amount needed to trigger the relevant (higher) statutory maximum.
>
> <u>Id</u>. at 42, n. 4.

Thus, the higher statutory maximums are triggered by a jury finding that the conspiracy as a whole involves a drug quantity exceeding the statutory threshold – here, more than five kilograms**.** <u>See</u> <u>United States v. Bailey</u>, 270 F.3d 83, 89-90 (1st Cir. 2001)(error where defendant sentenced above statutory maximum when no finding of drug quantity that would trigger higher statutory maximum).

The question of what quantity of cocaine was foreseeable to a defendant is a question to

be determined by the Court at sentencing by a preponderance of the evidence.  See United States

v. Malouf, 466 F.3d 21, 26 (1st Cir. 2006)("[D]rug quantity for purposes of §841 is a sentencing

factor that may be determined by a preponderance of the evidence.")(quoting United State v.

Goodine, 326 F.3d 26, 32 (1st Cir. 2003)); United States v. Lizardo, 445 F.3d 73, 90 (1st Cir.

2006), cert. denied 127 S.Ct. 524 (2006).  Following the Supreme Court's decision in Harris v.

United States, 122 S.Ct. 545 (2002), a fact setting a mandatory minimum could be found by the

sentencing judge by a preponderance.  See also United States v. Colin-Solis, 354 F.3d 101, 103-4

(1st Cir. 2004)("to apply the mandatory minimum to a particular coconspirator, the sentencing

court must make a specific finding, supportable by a preponderance of the evidence, ascribing the

triggering amount to that coconspirator");United States v. Robinson, 241 F.3d 115 (1st Cir.

2001); United States v. Eirby, 262 F.3d 31 (1st Cir 2001); United States v. Copeland, 2003 WL

431897 (6th Cir. Feb. 25, 2003)(amending earlier opinion); but cf. United States v. Martinez, 234

F.Supp. 80 (D.Mass. 2002).

     The First Circuit has also made clear that imposing any "remedy" beyond that announced

by United States v. Booker, 125 S.Ct. 738 (2005) is not only unnecessary, but "wrong":

> There was a period between Blakely and Booker when the district
> courts were forced to predict and improvise.  Some courts, as the
> court did here [referring to United States v. Green, 346 F.Supp.2d
> 259 (D. Mass. 2004)] predicted wrongly that the Sixth Amendment
> concerns required as a remedy that certain issues (for instance,
> drug quantity) be decided by a jury, not a judge.  It is now well
> settled that this was wrong; the remedy was to make the Guidelines
> non-mandatory.

United States v. Yeje-Cabrera, 430 F.3d 1, 17 (1st Cir. 2005).  In doing so, the First Circuit has

squarely rejected the view that a district court could properly decide sentencing facts by adopting

the facts found by a jury beyond a reasonable doubt:

> The district court's <u>Apprendi</u> rationale for limiting its
> consideration of drug quantity was simply a wrong guess as to the
> direction the law would take.  The district court was not
> "constrained" by the jury's verdict, as it thought it was, to finding
> less than 500 grams of cocaine.  <u>Instead, it could (and should) have
> found Olivero responsible for the amount of cocaine established by
> a preponderance of the evidence against him</u> – though of course,
> the ultimate sentence may not exceed the statutory maximum of 20
> years.

<u>Yeje-Cabrera</u>, 430 F.3d at 23 (emphasis supplied); <u>see also</u> <u>United States v. Picanso</u>, 333 F.3d 1,

26 (1st Cir. 2003) (noting that it "would clearly be legal error" for a district court simply to adopt

a jury's factfinding in imposing a sentence).

In this case, in accordance with <u>Derman</u>, <u>Yeje-Cabrera</u>, <u>Lizardo</u>, and <u>Malouf</u>, and the

Supreme Court's decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the government will

propose a special verdict form that will seek a jury determination regarding simply the threshold

amount of cocaine, five kilograms.  This determination should be made only after consideration

of the elements of conspiracy.

### 4.    Admissibility of Co-Conspirator Statements as Non-Hearsay

Federal Rule of Evidence 801(d)(2)(e) provides that a "statement by a coconspirator of

the party during the course and in furtherance of the conspiracy" is not considered to be hearsay

and thus is admissible into evidence.  <u>See</u> Fed. R. Evid. 801(d)(2)(e).  To make use of this rule,

the government must prove by a preponderance of evidence that 1) a conspiracy existed between

the declarant of the statement and the defendant, and that the declarant uttered the statement 2)

during the course of and 3) in furtherance of the conspiracy.  <u>See</u> <u>Bourjaily v. United States</u>, 483

18

U.S. 171, 175 (1987); United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002); United States v.

Petrozziello, 548 F.2d 20, 22 (1st Cir. 1977). In the First Circuit, a judge may conditionally admit

coconspirator statements during the trial, and make a final determination on admissibility at the

close of the evidence. United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002).

　　　　To satisfy the first requirement, the government must show that it is more likely than not

that the defendant was involved in the conspiracy, based in part on evidence other than the

contested statement. United States v. Piper, 298 F.3d at 52; United States v. Sepulveda, 15 F.3d

1161, 1181-82 (1st Cir. 1993).  The trial court is allowed to consider the content of the

coconspirator's statement and the surrounding circumstances in this inquiry, but the statement

itself is not sufficient to prove the defendant's involvement.  United States v. Sepulveda, 15 F.3d

at 1181-82.  The question of whether the defendant was involved in a conspiracy will duplicate

the elements of criminal conspiracy (see above), although the standard of proof is lower.  See

United States v. Ortiz, 966 F.2d 707, 716 (1st Cir. 1992); United States v. Gomez-Pabon, 911

F.2d at 856. However, if a large conspiracy involving multiple participants is charged in the

indictment, the government does not have to prove that the defendant was part of that large

conspiracy to admit the coconspirator's statement into evidence.  The government need only

prove that a lesser conspiracy existed between the defendant and the declarant.  United States v.

Piper, 298 F.3d at 54-55; Dworken v. United States, 855 F.2d 12, 24 (1st Cir. 1988).  Further, the

statement may be admissible against the defendant even if the statement was made before the

defendant joined the conspiracy, because defendants are deemed to have adopted previous

coconspirator statements by the act of joining.  United States v. Saccoccia, 58 F.3d 754, 778 (1st

Cir. 1995).

To determine whether a statement was made "during the course of" the conspiracy, the trial court may rely solely upon the statement itself. See United States v. Piper, 298 F.3d at 52, 54. A statement is considered to be "during the course of" the conspiracy so long as the conspiracy is ongoing and the defendant is a participant in the conspiracy. United States v. Palow, 50, 56-57 (1st Cir. 1985); United States v. Mason, 658 F.2d at 1269. If a conspiracy consists of an ongoing criminal enterprise, it is "presumed to exist until there has been an affirmative showing it has terminated." United States v. Piper, 298 F.3d at 53 (citations omitted); United States v. Palow, 777 F.2d at 57 (citing Fed. R. Evid. 801(c)(2)(e), advisory committee's notes). Similarly, the burden is on the defendant to prove he withdrew from a conspiracy, by making an affirmative showing that he confessed to law enforcement, or that he clearly communicated to other coconspirators that he was leaving the conspiracy. United States v. Piper, 298 F.3d at 53. Otherwise, statements made by coconspirators may be used against the defendant. See id.

In order to prove the statement was "in furtherance" of the conspiracy, the government may depend solely on the statement itself. United States v. Piper, 298 F.3d at 52, 54. The government must show that it is more likely than not that the coconspirator's statement advances the goals of the conspiracy in some way. See United States v. Martinez-Medina, 279 F.3d at 117. Statements that are merely "idle conversations among criminal partners" do not meet the "in furtherance of" requirement. Id.

The First Circuit has generally interpreted the "in furtherance" requirement broadly, so long as the intent behind the statements appears to be to assist the conspiracy in some way. See United States v. Martinez-Medina, 279 F.3d at 117; United States v. Sepulveda, 15 F.3d at 1180-

20

81; United States v. Masse, 816 F.2d 805, 811 (1st Cir. 1987). In United States v. Sepulveda, the First Circuit found that the reporting of a significant past event was considered to be "in furtherance" because such events can have a serious impact on the outcome of the conspiracy. See 15 F.3d at 1180 (citation omitted). There, one coconspirator told another about how police had found drugs on him during a search, presumably as a warning of danger to the  conspiracy. Id. Similarly, the First Circuit has found a conversation explaining the mode of operation of the conspiracy to be "in furtherance" of a conspiracy. United States v. Masse, 816 F.2 at 811. In that case, a coconspirator told an undercover policeman acting as a buyer that the defendant was the source of the drugs, presumptively in order to reassure and forge trust with the buyer. See id.

However, the First Circuit and other Circuits generally draw the line at casual discussions of past events that appear to be made with a purpose other than advancing the conspiracy. United States v. LiCausi, 167 F.3d 41, 50 (1st Cir. 1999); United States v. Darwich, 337 F.3d 645 (6th Cir. 2003). In a case where a conspirator told his girlfriend about supermarket robberies he had committed and attempted to commit in the past, the First Circuit found it to be idle chatter and therefore inadmissible. United States v. LiCausi, 167 F.3d at 50. There, the court found that the context suggested the coconspirator was merely "blowing off steam or venting anxiety" as opposed to reporting a significant event to assist the conspiracy. Id. In United States v. Darwich, the Sixth Circuit found that the statements made by two nephews to their uncle about how much marijuana they had bagged at work each night was idle chatter. 337 F.3d at 657, 658. Again, the court interpreted this as "casual conversation" about the nephews' days at work, rather than information conveyed to help the conspiracy. Id. at 658.

Finally, under United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980), at the close

21

of all the evidence the court should make its *Petrozziello* determination about the admissibility of co-conspirator statements.  See Ortiz, 966 F.2d at 715.

6.    The Law of Multiple Conspiracies

Defendants charged with conspiracy often respond with the defense of multiple conspiracy.  In this defense, the defendant argues that the evidence shows that he or she was involved only in a lesser conspiracy, not the large conspiracy charged in the indictment.  See United States v. Perez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003), cert. denied sub nom. Ruiz v. United States, 541 U.S. 1005 (2004); United States v. Soto-Beniquez, 356 F.3d 1, 18 (1st Cir. 2003), cert. denied sub nom. Vega-Pacheco v. United States, 541 U.S. 1074 (2004), cert denied sub nom. Vega-Colon v. United States, 541 U.S. 1074 (2004).

The question of whether the evidence at trial proves multiple lesser conspiracies or the single conspiracy charged in the indictment is a matter of fact for the jury to decide.  United States v. Drougas, 748 F.2d at 17.  However, in the First Circuit, a multiple conspiracy jury instruction is only required when "a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged," based on the evidence at trial.  United States v. Balthazard, 360 F.3d 309, 315 (1st Cir. 2004); United States v. Brandon, 17 F.3d 409, 449 (1st Cir. 1994).  Thus the trial court should allow a multiple conspiracy charge only when the finding of multiple conspiracies is a "plausible conclusion".  United States v. Brandon, 17 F.3d at 450.

Several other Circuits have adopted standards on multiple conspiracy instructions that are similar to that of the First Circuit.  See United States v. Erwin, 793 F.2d 656, 662 (5th Cir., 1986); United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir., 1989); United States v.

Calderon, 127 F.3d 1314, 1328 (11th Cir., 1997).  The Ninth and Eleventh Circuit have stated that a multiple conspiracy instruction is required when the indictment charges many defendants with an overall conspiracy, but the proof indicates a jury could reasonably conclude that multiple conspiracies existed.  United States v. Anguiano, 873 F.2d at 1317; United States v. Calderon, 127 F.3d at 1329.  The Fifth Circuit has adopted a slightly stricter standard, where a multiple conspiracy jury instruction must be given if evidence "arguably raises a question of multiple conspiracy."  See United States v. Erwin, 793 F.2d at 662.

The First Circuit takes a very fact specific approach to determining whether a reasonable jury could find more than one conspiracy.  See United States v. Brandon, 17 F.3d at 449-450; United States v. Dwyer, 843 F.2d 60, 62-63 (1st Cir. 1988).  In United States v. Brandon, the First Circuit found that the trial court had probably erred in refusing to grant a multiple conspiracy jury instruction because the record in that case was voluminous and very complex. 17 F.3d at 450.  The case involved a large loan fraud scheme with many participants, where the facts suggested that some of the participants were unaware of the essential nature or ultimate purpose of the scheme. See id. at 418-421.  In United States v. Dwyer, the court found that the court may have erred in refusing to grant a multiple conspiracy jury instruction where the trial court itself had suggested the existence of multiple conspiracies in an 801(d)(2)(e) evidentiary hearing.  See 843 F.2d at 61.  There, the defendant and other employees of a construction company made illegal draws on a loan, and the other employees continued to make illegal withdrawals without the defendant's knowledge or participation. Id. at 62.

The multiple conspiracy defense is often used in hub-and- spoke conspiracy cases. A hub-and-spoke conspiracy (sometimes referred to as a wheel conspiracy) is a model in which a central

23

"hub" figure or core group deals with each coconspirator or "spoke" individually, so that the spokes may have little or no contact with each other.  United States v. Newton, 326 F.3d 253, 255 n.2 (1st Cir. 2003).  Although a hub-and-spoke conspiracy may resemble multiple conspiracies, many hub-and-spoke conspiracies are shown to be single conspiracies.  See United States v. Rivera-Rodriguez, 318 F.3d 268, 273 (1st Cir. 2003); United States v. Portela, 167 F.3d 687, 697 (1st Cir. 1999); United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995).

A hub-and-spoke conspiracy is considered to be single conspiracy if there is a "rim" surrounding the spokes.  See Kotteakos v. United States, 328 U.S. 750, 754-755, 773 (1946). The First Circuit has suggested that a rim exists if the spokes have at least a general knowledge of the other spokes existence.  See Portela, 167 F.3d at 697; United States v. DiGregorio, 605 F.2d 1184, 1192 (1st Cir. 1979).  This knowledge can be inferred in drug conspiracy cases if there is evidence that various spokes of the conspiracy depended on each other for the health of their own business.  United States v. Martinez Medina, 279 F.3d 105, 114 (1st Cir. 2002); Portela, 167 F.3d at 697.  In the United States v. Portela, all the spokes of a cocaine importing hub-and-spoke conspiracy were found to be part of one conspiracy, because all the spokes relied on each other's existence for their individual businesses to survive.  See 167 F.3d at 696-699. The drug supplier, for example, depended on the existence of the drug smuggler and individual dealers within the United States to ensure his supplying business remained profitable, even if the drug supplier did not personally know the dealers or the smuggler.  See id.

B.      Admissibility of Title III Intercepted Telephone Conversations

        1.      Voice Identification

Authentication under Federal Rule of Evidence 901(b)(5) allows a witness to identify a

voice by opinion evidence based upon "hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed. R.Evid. 901(b)(5). Further, the voice may be heard either firsthand or through some sort of recording or electronic transmission. Id.

Because Rule 901(b)(5) permits a voice on a wiretap to be identified based on that voice being heard "at any time," participants in a conversation as well as nonparticipants may identify the voice. Fed R. Evid. 901(b)(5) advisory committee note. Generally, nonparticipants may identify a voice so long as they have "minimal familiarity" with the person connected to the voice. See United States v. Bush, 405 F.3d 909, 919 (10th Cir. 2005); United States v. Degaglia, 913 F.2d 372, 376 (7th Cir. 1990)(citations omitted); see also United States v. Kornegay, 410 F.3d 89 (1st Cir. 2005) (finding that witness must be "sufficiently familiar" to visually identify the witness). "Once minimal familiarity is satisfied, it is for the jury to assess any issues regarding the extent of the witness' familiarity with the voice." Bush, 405 F.3d at 919. In United States v. DiMuro, the First Circuit found that a law enforcement agent could identify the voice from intercepted conversations as the defendant based on talking to the defendant for "a short period" at his house and then talking to him a year later at the federal courthouse. United States v. DiMuro, 540 F.2d 503, 514 (1976). Other circuits have found as little as 30 seconds creates sufficient familiarity in order to authenticate a voice on a recording. See, e.g., United States v. Cooper, 868 F.2d 1505, 1519 (6th Cir. 1989).

When evidence of the witness' familiarity with a certain person is weak, the First Circuit has allowed circumstantial evidence may be used to bolster a voice identification. United States v. Portalla, 985 F.2d 621, 623 (1st Cir. 1993); United States v. Angiulo, 847 F.2d 956, 967 (1st Cir. 1988); United States v. DiMuro, 540 F.2d at 513. In United States v. Portalla, a detective

identified the voice in certain intercepted conversations as the defendant based on contact with him that had been frequent but had been over two years ago. 985 F.2d at 623. While the court found that this evidence "might well have been stronger," it was sufficient because it was buttressed by circumstantial evidence of the tapped telephone belonged to the defendant's sister in law, a phone similar to the tapped phone being found on the defendant's person, and the voice responding on that line to the defendant's nickname. Id. Similarly, in United States v. Anguilo, the voice identification of a detective who had engaged in personal conversations with the defendant was supported by circumstantial evidence that the defendant was present at the address of the phone that was tapped during intercepted conversations. 847 F.2d at 967. Circumstantial evidence may even be sufficient to prove identity. United States v. DiMuro, 540 F.2d at 514. In United States v. DiMuro, voice identification was deemed sufficient when a voice in an intercepted conversation identified himself by his first name and gave his telephone number. Id.

Generally, voice identification is a proper subject for lay testimony. See Fed. R. Evid. 901(b)(5) advisory committee's note; United States v. Salimou, 182 F.3d 63, 73-74 (1st Cir. 1999); United States v. Hardwell, 80 F.3d 1471 (10th Cir. 1996). Expert testimony is usually not appropriate because a lay person without any training can identify voices that they have heard before, or notice differences between the way two voices sounded in two different recordings. United States v. Salimou, 182 F.3d at 74. In United States v.Salimou, the First Circuit found that expert testimony of a linguist was properly excluded because the jurors could determine the differences between voices in two different tapes themselves without any specialized knowledge. Id. Expert testimony on voice identification may only be admitted if it is based on some sort of scientific or specialized knowledge, such as a spectrogram computer program that analyzes and

26

compares the frequency and magnitude of speech signals from recordings. See, e.g., United States v. Salimou, 182 F.3d at 63.

In this case, the government will offer the testimony of co-defendant Manuel Germosen to identify the voices of Benito Grullon and his brother Christian Germosen. In addition to Germosen's testimony, the government will also seek to introduce circumstantial evidence to prove Grullon's identity on the wiretap including phone records and the wiretap calls themselves where Germosen's refers to Grullon as "Benito." In addition, the government will offer the testimony of SA Drouin, TFA Cepero, and TFA Picardi to identity the voices of Manuel Germosen and Phil Asaro in the wiretap calls, but not the voice of Benito Grullon..

    2.     Admissibility of Transcripts

In the First Circuit's opinion in United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986), the court held that English-language translations of tape-recorded conversations that originally took place in Spanish are admissible as substantive evidence. The court further held that such transcripts may go to the jury room and that the government may use readers to read the English translations as an alternative to playing the tape recording. Id.

"Once translation and transcription disputes have been addressed and the transcripts have been submitted to the jury for its use, parties using audio recordings in other languages should ensure that the English transcripts become part of the record by introducing them in evidence." United States v. Morales-Madera, 352 F.3d 1, 8-9 (1st Cir. 2003). The trial court, however, retains discretion as to what documentary evidence the jury is permitted to have during deliberations. Id., citing United States v. McCarthy, 961 F.2d 972, 978 (1st Cir. 1992). Nevertheless, "should the defendant fail to offer either a sufficient objection during playback of

the tape, or an alternative transcript, the district court does not abuse its discretion by authorizing use of the government's duly authenticated transcript during jury deliberations subject to an appropriate cautionary instruction." United States v. Ademaj,

170 F.3d 58, 65 (1st Cir. 1999)

C.    Other Evidentiary Issue - The Federal Rules of Evidence

1.    Chain of Custody of Evidence

Under the Federal Rules of Evidence, authentication is a condition precedent to admissibility.  See Fed.R.Evid. 901(a) (noting that for authentication purposes, sufficient evidence is required "to support a finding that the matter in question is what its proponent claims").  "The district court must determine if there is a reasonable probability that the evidence is what it is purported to be. United States v. Barrow, 448 F.3d 37, 42 (1st Cir. 2006)(internal quotations and citations omitted). Once this is established, "[a] possible defect in the chain of custody for a certain piece of evidence factors into the weight given to the evidence rather than its admissibility." United States v. Scharon, 187 F.3d 17, 22 (1st Cir.1999); United States v. Rodriguez, 162 F.3d 135, 144 (1st Cir. 1998)("A possible defect in the chain of custody for a certain piece of evidence factors into the weight given to the evidence rather than its admissibility."); United States v. Abreu, 952 F.2d 1458 (1st Cir.1992)("[e]ven though there may be gaps in the chain of custody for a certain piece of evidence, such gaps factor into the weight given to the evidence rather than its admissibility.").  "[T]he prosecution's chain-of-custody evidence must be adequate-not infallible." United States v. Ladd, 885 F.2d 954, 957 (1st Cir.1989).

In United States v. Abreu, 952 F.2d 1458 (1st Cir.1992), the First Circuit set forth the

standards to be applied by the district court in cases where the chain of custody of evidence is a contested issue:

> In determining whether the evidence is admissible, the trial court must conclude that it was reasonably probable that the evidence had not been altered since the occurrence of the crime. The evidence in question is properly admitted if it is readily identifiable by a unique feature or other identifying mark. On the other hand, if the offered evidence is of the type that is not readily identifiable or is susceptible to alteration, a testimonial tracing of the chain of custody is necessary. The purpose of testimonial tracing is to render it improbable that the original item either has been exchanged with another or has been tampered with or contaminated.

> Id. at 1467 (internal quotation marks and citations omitted).

Furthermore, "the fact that portions of the tapes are unintelligible is not necessarily an impediment to the admission of the tapes." United States v Panzardi-Lespier, 918 F.2d 313, 318 (1st Cir. 1990); United States v. Bernal, 884 F.2d 1518, 1523-24 (1st Cir.1989). Instead, the standard the First Circuit applies provides "that where a recording is challenged on the grounds of inaudibility the question is whether the inaudible parts are so substantial as to make the rest more misleading than helpful." Bernal, 884 F.2d at 1523 (internal quotations and citations omitted).

2.      Testimony of TFA Jaime Cepero - Fed. R. Evid. 701

The Rules of Evidence permit law enforcement agents to provide opinion testimony as lay witnesses about the meanings of conspiracy-specific coded terms such as nicknames, reference to places and events gleaned from listening to a wiretap. See United States v. Garcia, 2005 WL 1444146 *7-12 (2nd Cir. (NY)); United States v. Grinage, 390 F.3d 746, 750 (2nd Cir. 2004), cert. denied sub. nom. Reneau v. United States, 125 S. Ct. 1961 (2005); United States v. Peoples, 250 F.3d 630, 641 (8th Cir. 2001). Although the First Circuit has not addressed this issue, several other circuits have allowed a law enforcement agent to testify as lay witnesses

29

about such topics.  United States v. Miranda, 248 F.3d 434, 441 (5th Cir. 2001); United States v. Novaton, 271 F.3d 968 (11th Cir. 2001), holding modified by Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1223 n.7 (11th Cir. 2003)(extending Novaton's holding to post-amendment Rule 701); United States v. Garcia, 994 F.2d 1499, 1507 (10th Cir. 1993).

For a law enforcement agent to testify about his opinion as a lay witness concerning conspiracy specific phrases heard through a wiretap, the witness must have personally perceived the conversation as it occurred.  United States v. Peoples, 250 F.3d at 641; United States v. Novaton, 867 F.Supp. 1023, 1025 (S.D. Fl. 1994). This does not require that the agent engage in the conversation in question or that the participants must be aware of the agent's presence, but that the agent overhead the conversation at the time it occurred over the wiretap.  United States v. Novaton, 867 F. Supp. at 1025; compare United States v. Peoples, 250 F.3d 630, 640-41 (8th Cir. 2001)(error to admit an FBI agent's lay testimony about the meaning of conspiracy-specific words, because agent had not listened to the conversations as they occurred and instead based her opinion only on "investigation after the fact").  In United States v. Novaton, monitors of wiretap conversations were allowed to testify as lay witnesses concerning references to planned drug sale events because the monitors testified only about conversations that they themselves listened to as the conversation occurred. 867 F.Supp. at 1025, 1026.

The Fifth, Eighth and Eleventh Circuits have held that an agent might have personal knowledge of the facts of the conversation based listening to the overheard conversation at some point in time, and on his overall participation in the wiretap investigation or experiences with the suspects.  See United States v. Peoples, 250 F.3d at 641; United States v. Miranda, 248 F.3d at

441; United States v. Novaton, 271 at 1008.  For example, the Fifth Circuit in United States v. Miranda allowed a FBI agent to testify about the meanings of coded words used only by the conspiracy because he had "extensive participation in the investigation of this conspiracy, including surveillance, undercover purchases of drugs, debriefings of cooperating the monitoring and translating of intercepted telephone conversations." 248 F.3d at 441. Implicitly, the court accepted that this agent's first hand knowledge came not from only what he directly overheard, but the totality of his experiences within the investigation.  See id.

Significantly, the First Circuit has found that the perception requirement of Rule 701 could be meet by personal knowledge based on past experience or even experiences that occur later.  See United States v. Wilkerson, 411 F.3d 1, 7 (1 st Cir. 2005); United States v. Ayala-Pizarro, 407 F.3d at 28-29. In United States v. Ayala-Pizarro, a policeman was allowed to testify as a lay witness about a certain street being a drug point. 407 F.3d at 28-29.  There, the First Circuit held that the police officer had met the first hand perception requirement because he had "particularized knowledge" as the police officer whose assignment was to patrol that street frequently.  Id.   Similarly, in United States v. Wilkerson, the First Circuit allowed a detective to testify his opinion as to the meaning of the defendant's post-arrest statement concerning his attempt to escape capture.  411 F.3d at 6-7.  The court found that the detective had met the "perception" requirement because he had "special familiarity" with the defendant's escape route, having investigated it both before and after interrogating the defendant. Id.

In this particular case, TFA Jaime Cepero will testify about the wiretap calls which will be introduced as exhibits in the case.  TFA Cepero, who has also been Trooper with the Massachusetts State Police for approximately twenty-three years, is a native Spanish speaker and

was responsible for the administration of the wiretap during the year long investigation.  TFA Cepero listened to the calls as they occurred, reviewed the calls, and relayed the information about these calls to the agents in the field.

The government will seek elicit the following testimony during the examination of TFA Cepero.  First, the authentication of the wiretap.  This will include information about how the wiretap calls were monitored, recorded and stored as evidence.  TFA Cepero will testify about the authenticity of the audio recordings as well as the information regarding the pen register data which was associated with the wiretap calls to memorialize the date, time, duration, and dialed numbers during the wiretap phone calls.

Second, TFA Cepero will testify about the role of Manuel Germosen in the conspiracy and identify Germosen's voice on the wiretap.  A wiretap was on Germosen's phone for more than six months, from August 2003 to April 2004, to which TFA Cepero listened nearly every day.

Third, based on his prior experience, including wiretaps and undercover work, TFA Cepero will testify that narcotics traffickers rarely use the word "drug" or "cocaine" on the phone.  Instead, drug traffickers often used code or slang terms.  TFA Cepero will testify that Germosen's and Grullon's use of the words "girl" is a common code/slang for cocaine; the term "papers" is also common code/slang for money.  TFA Cepero will testify that drug traffickers often use pre-paid phones, phones subscribed to other individuals, and often change their phones to avoid detection by law enforcement.

Conclusion

Accordingly, the government hereby submits this pretrial memorandum of law and fact

for the trial beginning on January 16, 2007.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:      /s/ Neil J. Gallagher, Jr.
Neil J. Gallagher, Jr.
Sharron Kearney
Assistant U.S. Attorneys
One Courthouse Way
Boston, MA

Date: January 8, 2007

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and mailed to all those not participating in ECF.

/s/ Neil J. Gallagher, Jr.
Neil J. Gallagher, Jr.