UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10299-PBS |
| | ) | |
| BENITO GRULLON | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR MISTRIAL**

**INTRODUCTION**

The defendant, Benito Grullon, has moved this Honorable Court, pursuant to Rule 26.3 of the Federal Rules of Criminal Procedure for a mistrial, and release from unlawful restraint. Defendant requests a mistrial as the Court has not entered a judgment in this matter. This memorandum and the Affidavit and Exhibits attached hereto are submitted in support of the motion and incorporated therein by reference.

The government's case against the defendant required proving beyond a reasonable doubt that Mr. Grullon was the voice on the recorded wiretap conversation involved in the conspiracy. The voice identification of Mr. Grullon was a highly contested issue by the defense and a pivotal part of the defense's theory of the case that the voice on the wiretaps was someone other than Mr. Grullon. The only evidence presented at trial that the voice of the defendant was the same voice on the wiretaps was the testimony of cooperating witness, Manuel Germosen, who gave conflicting statements during his testimony and had motive to provide information that would lead to a conviction given his cooperating agreement with the US Attorney's Office to provide "substantial assistance" in exchange for a reduced sentence.

1

Against this backdrop, Mr. Grullon was denied his Sixth Amendment Right to a fair trial by an impartial jury because prejudicial extraneous information tainted the jury deliberation and influenced the credibility of defense counsel and the theory of defense presented. The webpage found in the jury room came from a website containing links to numerous legal resources as well as other offensive material aimed at attorneys in private practice. It is evident that at least one juror browsed this site, in violation on the Court's instruction to avoid research on the internet. Since this extraneous information was not discovered until after the conclusion of jury deliberation, there was no way for the defendant to presently evaluate the prejudicial effect upon the deliberation process. The right to a trial by an impartial jury afforded by the Sixth Amendment is both fundamental and essential to a fair trial and due process of law. When the possibility of a tainted juror comes to light, it becomes apparent that the justice may not have been served, and therefore the defendant is entitled to a mistrial pursuant to Rule 26.3 of the Federal Rules of Criminal Procedure.

## **PROCEDURAL HISTORY**

On January 25, 2007, Mr. Grullon was found guilty, after a jury trial, of conspiracy to distribute cocaine. Judgment has not yet entered, and Mr. Grullon sentencing is scheduled for April 26, 2007.

## STATEMENTS OF FACTS

Mr. Grullon was charged with conspiracy to distribute cocaine and was represented at trial by Attorney Eduardo Masferrer, who was appointed to Mr. Grullon's case under the Criminal Justice Act.

The government's first witness was a paid informant working with the DEA, Fernando Soto. In 1993, after he was arrested, Mr. Soto agreed to cooperate with the DEA in exchange for a reduced sentence, assistance with his immigration status, and money. Mr. Soto, worked for the DEA about eight years, was paid in excess of $215,000 and received an S-Visa that was later adjusted to a Legally Permanent Resident in exchange for his information. His testimony at trial would focus on a controlled purchase that took place on July 30, 2003, at 33 Fuller Street in Lynn, MA. The paid informant, Mr. Soto, lived at this location, and his tenant Hector Munoz was a drug dealer, who maintained a secret compartment within his residence.

According to Mr. Soto's testimony, Mr. Munoz stated that he could put Mr. Soto in contact with his supplier, a man by the name of "Benny." Mr. Soto was equipped with a kel-wire and $3,600 upon entering 33 Fuller Street to complete the transaction. When Mr. Soto, met again with his primary handler, Detective Edwards, he provided Detective Edwards with the kel-wire and the 120 grams of cocaine he purchased. The kel-transmitter, also known as a "body-wire," permitted the agents to hear and record the audio. However, Detective Edwards lost the kel recording, therefore leaving Mr. Soto's testimony as the only evidence as to what occurred inside 33 Fuller Street.

Mr. Soto claims that "Benny" reached into his pants in the groin area and retrieved a package of cocaine, which he gave to Mr. Soto. However, the defense presented

3

evidence at trial of a "secret hide" located inside 33 Fuller Street, in the same apartment the controlled purchase took place. Mr. Soto also alleges that "Benny" then gave Mr. Soto his cell phone number, 781-913- 6228. Mr. Soto was advised to continue attempting to contact "Benny" to set up other purchases and record all phone calls as well as take notes of those calls. Mr. Soto testified to following this procedure when making his attempts to contact "Benny" on the telephone.

During trial, defense counsel presented impeachment evidence against Mr. Soto that contradicted his statements to DEA and went towards his credibility. Mr. Soto had failed to inform the DEA of the fact that he was involved in bankruptcy proceeding due to credit card debt in excess of $40,000. Mr. Soto also testified to seeing and talking to the defendant at a barbeque that took place at 33 Fuller Street, however this testimony cannot be corroborated because he failed to advise the DEA of this contact with the "target," Mr. Grullon. Moreover, Mr. Soto was unclear during his testimony as to the number of contacts or extent of communication he had engaged in with the defendant.

The next witness for the government, Detective Stephen Edwards, a Cambridge detective assigned to the DEA in Boston as a task force agent. Detective Edwards was the primary handler for the paid informant, Mr. Soto. According to his testimony, Detective Edwards met with Mr. Soto approximately 2 to 3 times a week, however, Detective Edwards was not aware of Mr. Soto's financial troubles and bankruptcy claim or that Mr. Soto alleged to have seen Mr. Grullon at a barbeque.

Detective Edwards was the task force agent on duty July 30, 2003, when the controlled purchase took place at 33 Fuller Street. Detective Edwards testified that he followed standard procedures when dealing with an informant, such as conducting a

4

search of his person and his vehicle prior to engaging in the controlled purchase, because this procedure assures officers that the informant does not have access to any other drugs. However although Detective Edwards knew that the informant lived inside the residence where the controlled purchase would take place, and therefore could have had access to other drugs, he never conducted a search of the residence. Detective Edwards testified to overhearing the conversations taking place in Spanish between the individuals during the controlled purchase, although he could not understand or interpret since he does not speak Spanish. At trial, Detective Edwards testified that he heard three voices on the kel-wire, although a DEA-6 report authored by Detective Edwards alleges only hearing two voices on the kel-wire.

Detective Edwards was provided by Mr. Soto the kel-wire recording of the conversations between the individuals inside 33 Fuller Street as well as the cocaine purchased with the $3,600. In his DEA-6 reports, Detective Edwards states he followed proper procedure and placed the tapes with the audio from the kel-wire as well as tapes with recorded telephone conversation allegedly between Mr. Soto and "Benny" into a non-drug evidence locker. However, this statement is false given that Detective Edwards lost all the evidence tapes pertaining to this investigation. Furthermore, the working copies Detective Edwards alleged to have in his possession were blank and contained no recorded conversations. Mr. Soto's notes of these conversations, written by him in Spanish and then translated by his wife, were available at trial.

Detective Edwards was also the primary handler in another controlled purchase involving the paid informant, Mr. Soto, at 33 Fuller Street in Lynn, MA on October 20, 2003. This controlled purchase was also for 120 grams of cocaine and once again

5

involved Mr. Soto's tenant, Hector Munoz. During this controlled purchase the DEA conducted video surveillance, and that evidence is still in existence today. Mr. Grullon was not seen on any video surveillance taken during this controlled purchase.

The drugs obtained during the controlled purchase on July 30, 2003 and October 20, 2003, were both sent to a DEA forensics lab for analysis. At trial, DEA Forensic Chemist James Disarno, testified that both packages arrived in the same green packaging, were similar in weight, and were determined to be cocaine.

The government's primary witness, who was a cooperating witness, was Manuel Germosen. Mr. Germosen had signed a proffer agreement with the United States Attorney's Office to provide "substantial assistance" in return for a reduced sentence. As a result of his agreement with the US Attorney's Office, Mr. Germosen received "safety valve" and was protected from serving the mandatory minimum ten year sentence. Mr. Germosen testified to his alleged involvement with Mr. Grullon in the indicted conspiracy, to which Mr. Germosen claims that he and Mr. Grullon would supply and purchase cocaine from one another.

Upon initiation of an investigation into a Mexican cocaine organization, Mr. Germosen's cellular phones were wiretapped pursuant to a court order. During this wiretap investigation the police intercepted several phone calls involving Mr. Germosen in regards to the sale of cocaine. Amongst the numbers traced back to Mr. Germosen's cell phone was (978)-931-6228, the same number the paid informant, Mr. Soto, alleges was given to him by Mr. Grullon. There were other telephone numbers in which Mr. Germosen was speaking to an individual known to the DEA as "Quico." Mr. Germosen alleges that "Quico" is the same person as the defendant, Mr. Grullon. In fact, Mr.

6

Germosen's testimony is the only evidence identifying Mr. Grullon as the voice of "Quico." To show his knowledge that Mr. Grullon is "Quico," Mr. Germosen gave the US Attorney's office an explanation behind the nickname "Quico." According to Mr. Germosen, Quico Rodriguez is the name of a Dominican singer who has a song about someone with green eyes and he gave Mr. Grullon the name "Quico" because Mr. Grullon has "green" or "light" eyes. However, based on the arrest report of Mr. Grullon the color of his eyes are brown.

Mr. Germosen testified that he met Mr. Grullon through a client named Alex, which is contradictory to the response he gave at his initial interview with the US Attorney's office where he stated Felix Veras introduced him to Mr. Grullon. Mr. Germosen's testimony was unclear as to how many times he allegedly purchased or sold to Mr. Grullon and what the weights of those transactions were. Mr. Germosen also alleges making the drug transactions at Mr. Grullon's home, however when Mr. Grullon was arrested and his house searched there were no drugs found inside the residence.

Mr. Germosen testified that he worked for Andres Martinez and would distribute the cocaine that Mr. Martinez received and was paid a profit for his services by Mr. Martinez. To obtain "safety valve" Mr. Germosen, denied any involvement as a manager or boss in the indicted conspiracy to distribute cocaine. However during his testimony at Mr. Grullon's trial, Mr. Germosen gave testimony that he had his own clients and that he had his brother Christian and a woman named Maria deliver drugs on his behalf to Mr. Grullon and others. Mr. Germosen also testified to having other sources of cocaine supply, including a source in Connecticut.

The government's next witness, Trooper Jaime Cepero, was the agent involved

with monitoring the wiretap room during the DEA investigation into the cocaine organization.  Trooper Cepero testified that his duties included reviewing intercepts, monitoring live conversations and relaying important information.  Trooper Cepero was assigned to assist in this case because the majority of the conversations were taking place in Spanish and he is a Spanish speaker.  Trooper Cepero testified to hearing over 500 calls, however, he testifies that the individual speaking to Manolo from phone numbers ending in (6228), (0311), and (1231) are all the same person.  Although Trooper Cepero is a trained police officer with the Massachusetts State Police he has no formal training in voice identification.  Moreover, he makes this assertion although he heard over 500 calls all in Spanish.   Also, the phone records indicate that the phone numbers Trooper Cepero claims are all the same person were calling each other.

    The government's final witness was Agent Gene Drouin, the case agent in charge of the investigation.  Agent Drouin was the agent who met with Mr. Germosen to gather information and was the affiant on all the wiretap requests.  As the agent in charge, Agent Drouin oversaw the entire investigation that included about six months of wiretaps and surveillance.  Agent Drouin testified that there are hours of video surveillance regarding this investigation, however Mr. Grullon is not on any video surveillance.

    The defense presented one witness, Robert Diaz, a certified Private Investigator in the State of Massachusetts.  Mr. Diaz went to the property at 33 Fuller Street to conduct an investigation and was advised by the owner that the individual who installed the rug in apartment one noticed an awkward vent on the floor.  After conducting an investigation of the property, Mr. Diaz located a "secret hide" in the closet of apartment 1 at 33 Fuller Street, the same apartment both controlled purchases involving the paid informant Mr.

Soto occurred.  Photos of the "secret hide" were submitted at trial as evidence.

After deliberations the jury found the defendant guilty of conspiracy to distribute cocaine.  When clearing the jury room, the Court Clerk for Judge Saris, Robert Alba, found a webpage.  Defense Counsel was immediately notified of the webpage and provided a copy of same.

## ARGUMENT

### DISCOVERY OF PREJUDICIAL EXTRANEOUS INFORMATION AT THE CONCLUSION OF JURY DELIBERATION THAT TAINTED THE PROCESS VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY

Discovery of the webpage in the jury room after the conclusion of trial prevented the Court from inquiring as to the prejudicial nature of this document.  Consequently, Mr. Grullon was denied his right to a fair trial by an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution. Rule 26.3 of the Federal Rules of Criminal Procedure grants the Court the authority to give each party an opportunity to comment on the propriety of the order.  The Court should hold an evidentiary hearing where a motion raises the significant issue that a jury may have been biased or tainted by some incident, to determine whether the alleged incident and was prejudicial.  *See generally United States v. Gaston-Brito,* 64 F.3d 11, 12 (1st Cir. 1995)*; United States v. Ortiz-Arrigoita,* 996 F.2d 436, 442 (1st. Cir. 1993).

When a legitimate concern arises that a jury may have been tainted by extraneous prejudicial information, the court must carry out an adequate inquiry to determine the prejudicial implications on the defendant's right to a fair trial by an impartial jury.  *See Id; See also United States v. Anello,* 765 F.2d 253, 259-59 (1st Cir.) (when allegations of

9

jury misconduct are made, the trial court must investigate to ascertain whether the misconduct occurred and its possible prejudicial effect on the jury), *cert. denied* 474 U.S. 996 (1985). In *Smith v. Phillips,* 455 U.S. 209 (1982), the Supreme Court explained that "due process means a jury capable of and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Given that the discovery of the webpage was not until after the delivery of a verdict by the jury, there was no way for the trial judge to evaluate its possible prejudicial effect on the jury's deliberation. The court in *Boylan* adopted the Second Circuit's objective standard for a post-verdict determination of extra-record prejudice, which is measured by reference to its probable effect on a "hypothetical juror." *United States v. Boylan,* 898 F.2d at 262 (quoting *United States v. Calbas,* 821 F.2d 887, 896 (2nd Cir. 1987).

      In this case, defense counsel was notified of a webpage found in the jury room the same day a verdict was reached. (See attached Exhibit A). The webpage titled, "Sharks and Lawyers – A Comparative Study," is a comparison between sharks and lawyers indicating a similar derivation between the two. The primary cause for concern is that a juror brought in outside material into the deliberation room and apparently disseminated it to the other jurors. It is unclear what the purpose was in introducing outside materials to the jurors. It is certainly evident that one juror had a potential bias towards the legal process and violated the Court's order by doing independent research on the internet. Furthermore, it is clear that the juror accessed this information prior to the start of deliberation on January 24th, as indicated by the access information showing a date of January 23, 2007. (See Exhibit A). Moreover, the context of the personalized note

indicates that the intention was to share the information with other jurors. (See Exhibit A). Given the potential implication that every juror could have viewed the webpage, the Court needs to evaluate any potential bias or prejudice it could have had on the jury deliberation because it is the court's obligation to develop relevant facts on the record, not merely presume them. *Gaston-Brito,* 64 F.3d at 13.

In addition, the web page itself contains links to legal materials, cases, and other law-related databases. It is unclear whether the juror accessed these pages or materials or if any other juror accessed them. Again the conducting of legal research or looking at law-related web sites directly violates the Court's order regarding abstaining from doing such research on the internet.

Lastly, the webpage claims lawyers, like sharks, "are spineless – as willing to argue one side of a case as the other. For the right price." The webpage also claims that lawyers, like sharks, "will swallow anything – even their pride – as increasing numbers of lawyer hopefuls trudge to law school each year for three years of browbeating in the hopes of financing their Porches." (See Exhibit A) Although an attempt at humor, statements of this nature simply cast negative stereotypes upon the legal profession and the credibility of lawyers, specifically lawyers in private practice because a lawyer in private practice is presumed to practice law and seek clients for a monetary gain. In fact, a sub-page of webpage titled, "James Fuqua's Law Jokes", has a disclaimer warning visitors that the content on this page could be found offensive. (See attached Exhibit D) In this case, it can be inferred that such a presumption would be made regarding the defense attorney, who is assumed to have been hired or appointed in exchange for a fee. As such, this webpage had a prejudicial effect on the credibility of the defense theory

11

presented at trial. At the core of the theory of defense was the assertion that the defendant was not the individual on the intercepted wiretap conversations.  However if the jury assumes that defense counsel is "spineless" and willing to argue anything for the "right price," it prejudices the defendant because it assumes that the Government is only allowed to argue the truth, while a defendant can invent any group of facts. The website violates the Defendant's Sixth Amendment right to a fair trial not because it casts defense attorneys in a bad light, but because it promotes and bolsters the credibility of the Government prosecutors, who unlike defense attorneys, are arguing because they believe in the case, and not because they are paid to do so. As such it, in essence, assumes that the government must be right because they have no motive to arguing anything but the truth, while Defense Counsel would simply make up anything because they are paid to do so.

Such an assumption about the roles of the attorneys at trial violates the Defendant's Sixth Amendment right to a fair trial by an impartial jury since deliberation could be affected by this assumption or stereotype, and thus the verdict is based on more than the evidence presented at trial. In other words, the jurors may have believed that the Defendant's theory was not true simply because the government prosecutors said that the Defendant was guilty and they have no reason to lie.

Inquiry of all jurors may be conducted when a prejudicial matter is likely to have reached any one of them.  *Corbin,* 590 F.2d at 401, *see, e.g., United States v. Rhodes,* 556 F.2d 599, 601 (1st Cir. 1977).  The webpage was personalized with a message and signature of a juror, indicating that at least one juror could have been biased. (See Exhibit A) The Court's inability to conduct an investigation prior to the verdict in this case into

the alleged juror misconduct creates the substantial likelihood that Mr. Grullon was convicted by a jury, which was tainted, biased and prejudiced by extraneous material that entered into the deliberation process. The lack of an adequate investigation can form the basis for the Court granting a new trial. *See Rhodes,* 556 F.2d 599 (where the Court set aside the verdict and granted a new trial since inquiry of jury was not conducted upon defendant's filing of a motion for a new trial alleging juror misconduct and so much time had elapsed since the discharge of the jury); *United States v. Perrotta,* 553 F.2d 247 (1st Cir. 1977) (where conviction was reversed and remanded for new trial because the district court failed to conduct an inquiry of the jury as soon as potentially prejudicial information was brought to the court's attention). Although in this case the evidence of prejudicial information came to light after the conclusion of trial, the Court must still consider that an inquiry was not conducted and therefore the potential bias of the jury was not assessed prior to their deliberation. *See generally Perrotta,* 553 F.2d 247. As such, without a clear indication that an impartial jury afforded the defendant his Sixth Amendment right to a fair trial, an inquiry must be conducted.

## **CONCLUSION**

For the reasons stated above, the defendant requires that the Court grant him an evidentiary hearing on this motion and, after receiving evidence, vacate the conviction and grant him a new trial.

> Respectfully submitted,
>
> _/s "Eduardo Masferrer"____
> Eduardo Masferrer
> BBO # 644623
> Masferrer & Associates
> 6 Beacon Street, Suite 720

Boston, MA 02108
(617)-531-0135